

JUDGE RAMOS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

15 CV 3031

| | |
|---|---|
| FEDERAL TRADE COMMISSION<br>600 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20580<br><br>Plaintiff,<br><br>vs.<br><br>CARDINAL HEALTH, INC.<br>7000 Cardinal Place<br>Dublin, OH 43017<br><br>Defendant. | Civil Action No.<br>15 CV 3031 (ER)<br><br>COMPLAINT<br><br>Filed:<br><br>RECEIVED<br>APR 20 2015<br>U.S.D.C. S.D. N.Y. |

## COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), by its designated attorneys, petitions this Court, pursuant to Section 13(b) of the Federal Trade Commission Act (the "FTC Act"), 15 U.S.C. § 53(b), for a permanent injunction, rescission or reformation of contracts, and other equitable relief, including disgorgement of ill-gotten gains, against defendant, Cardinal Health, Inc. ("Cardinal"), to undo, redress, and prevent its unfair methods of competition, in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### NATURE OF THE CASE

1. This action challenges Cardinal's illegal monopolization of the market for the sale and distribution of radiopharmaceuticals to hospitals and clinics in 25 geographic markets throughout the United States. Radiopharmaceuticals, which are distributed by radiopharmacies including Cardinal, are drugs containing a radioactive isotope combined with a chemical agent.

1

Medical providers administer these drugs to patients to perform a variety of diagnostic imaging procedures.

2. From 2003 to 2008 ("the relevant time period"), Bristol-Myers Squibb ("BMS") and Amersham plc, acquired in 2004 by General Electric Co. ("GE-Amersham"), were the only manufacturers of an essential input, heart perfusion agents ("HPAs"). During the relevant time period, a radiopharmacy could not profitably operate and compete in a local market without obtaining the right to distribute either Cardiolite (BMS's branded HPA) or Myoview (GE-Amersham's branded HPA).

3. Cardinal excluded potential entrants and maintained monopoly power in the 25 geographic markets by obtaining the *de facto* exclusive right to distribute both BMS's and GE's HPAs. These simultaneous exclusives did not enhance efficiency or otherwise serve procompetitive ends, but rather had the purpose and effect of insulating Cardinal's downstream monopolies from competition.

4. Throughout the relevant time period, Cardinal employed various tactics to induce or coerce BMS and GE-Amersham, the only two upstream manufacturers of HPAs, to refuse to grant HPA distribution rights to potential entrants in 25 markets in which Cardinal operated the only radiopharmacy. Cardinal had no legitimate business justification for these tactics.

5. Cardinal's resulting *de facto* exclusive distribution rights to both Cardiolite and Myoview blocked or significantly delayed potential entrants from gaining access to HPAs. Cardinal's conduct thereby denied customers of radiopharmaceuticals the benefits of competition and enabled Cardinal to amass substantial ill-gotten gains by charging *supra*-competitive prices in the 25 geographic markets.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 45(a) and 53(b), and 28 U.S.C. §§ 1331, 1337(a), and 1345.

7. This Court has personal jurisdiction over Cardinal pursuant to 15 U.S.C. § 53(b). Cardinal has the requisite constitutional contacts with the United States of America and the Southern District of New York.

8. Venue in this district is proper under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and 15 U.S.C. § 22 and 28 U.S.C. § 1391, because Cardinal transacts business in the Southern District of New York.

9. Cardinal's general business practices, and the unfair methods of competition alleged herein, are in or affecting commerce as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

10. Cardinal is, and at all relevant times has been, a "corporation" within the meaning of Section 4 of the FTC Act, 15 U.S.C. § 44.

## THE PARTIES

11. Plaintiff Federal Trade Commission is an administrative agency of the United States government established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 *et seq*. The Commission is vested with authority and responsibility for enforcing, *inter alia*, Section 5 of the FTC Act, which prohibits unfair methods of competition. The FTC is authorized under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), to initiate court proceedings to enjoin violations of any law the FTC enforces and to seek equitable monetary remedies.

12. Defendant Cardinal Health, Inc. is a publicly traded Ohio corporation with approximately $91 billion in annual revenues in 2014 and its principal place of business in

3

Dublin, Ohio. Among its various businesses, since 2003, Cardinal has operated the nation's largest chain of radiopharmacies, with approximately 150 locations.

13. During the relevant time period, Cardinal was also the largest purchaser of radiopharmaceutical inputs from manufacturers such as BMS and GE-Amersham. These inputs include, but are not limited to, HPAs, Technetium-99 generators, and Thallium-201.

## RELEVANT MARKETS

14. The relevant product market in which to analyze the effects of Cardinal's conduct is the sale and distribution of single photon emission tomography radiopharmaceuticals. These radiopharmaceuticals are also known as "low energy" radiopharmaceuticals (hereinafter "radiopharmaceuticals") and represent a cluster of approximately 30 products, including HPAs. Radiopharmacies prepare and deliver radiopharmaceuticals for nuclear imaging and other procedures and compete to provide hospitals and clinics with their requirements for the entire cluster of radiopharmaceuticals. There are no close substitutes for radiopharmaceuticals.

15. Hospitals and clinics rely on radiopharmacies to compound individually prepared "unit doses" of radiopharmaceuticals and to provide just-in-time delivery on a daily basis for both pre-scheduled and emergency procedures.

16. The relevant geographic markets for the provision of radiopharmaceuticals are local. Radiopharmaceuticals contain rapidly decaying radioisotopes, which necessitate that they be delivered to hospitals or clinics, and administered to patients, within hours of being compounded by a radiopharmacist. For reasons relating to logistics and patient care, hospitals and clinics need or strongly prefer radiopharmacies located in close proximity to their facilities that can deliver unit-doses within a short time frame.

4

17. The relevant geographic markets for purposes of this Complaint are the following cities and their surrounding areas:

1. Albany, New York
2. Birmingham, Alabama
3. Charlotte, North Carolina
4. Chattanooga, Tennessee
5. Columbia, South Carolina
6. Gadsden, Alabama
7. Gainesville, Florida
8. Greensboro, North Carolina
9. Huntington, West Virginia
10. Indianapolis, Indiana
11. Jackson, Mississippi
12. Jacksonville, Florida
13. Knoxville, Tennessee
14. Lexington, Kentucky
15. Little Rock, Arkansas
16. Louisville, Kentucky
17. Nashville, Tennessee
18. Omaha/Lincoln, Nebraska
19. Orange, Texas
20. Raleigh, North Carolina
21. Richmond, Virginia
22. Spokane, Washington
23. Tulsa, Oklahoma
24. Wichita, Kansas; and
25. Springfield, Missouri

## CARDINAL EMPLOYED UNFAIR METHODS OF COMPETITION IN ORDER TO MAINTAIN MONOPOLY POWER

18. Prior to 2003, Cardinal operated a network of radiopharmacies throughout the United States. Cardinal became the largest operator of radiopharmacies in the United States and the sole radiopharmacy operator in 25 local geographic markets by acquiring Syncor International ("Syncor") in 2003 and Geodax Technology Inc. ("Geodax") in 2004. After each of these acquisitions, Cardinal sought to unlawfully preserve its acquired dominant position in these markets, which would have otherwise experienced entry from rival radiopharmacies. Cardinal's exclusionary conduct was expressly designed to, and succeeded in, preventing competitors from entering these markets.

19. The focus of Cardinal's monopolization scheme was to block potential entrants from gaining rights to distribute radiopharmaceuticals containing HPAs. HPAs are used to perform heart stress tests, the most common procedure employing a radiopharmaceutical. During the relevant time period, sales of radiopharmaceuticals containing HPAs represented

5

almost 60% of a typical radiopharmacy's revenue and were therefore indispensable to the operation of a competitive and profitable radiopharmacy.

20. BMS and GE-Amersham were the only manufacturers of HPAs during the relevant time period. Unlike BMS, GE-Amersham also operated its own network of radiopharmacies in numerous areas (other than the relevant markets), where it competed directly with Cardinal. Both BMS and GE-Amersham employed distribution models that required radiopharmacies seeking to distribute their HPAs in a geographic area to obtain a license to do so in that area. During the relevant time period, an entrant therefore could not open a new radiopharmacy in a given geographic area and achieve minimum viable scale at that location without first obtaining a license to distribute either Cardiolite (BMS's HPA) or Myoview (GE-Amersham's HPA). In other words, in the radiopharmacy industry, obtaining HPA distribution rights for a given geographic area was a requirement of entry into a relevant market, and conversely, the inability to obtain HPA rights was a barrier to entry.

21. By virtue of its acquisition of Syncor in 2003, Cardinal became the only radiopharmacy in the following 17 markets where it previously had competed with Syncor:

1. Birmingham, Alabama
2. Chattanooga, Tennessee
3. Gadsden, Alabama
4. Gainesville, Florida
5. Indianapolis, Indiana
6. Jackson, Mississippi
7. Jacksonville, Florida
8. Lexington, Kentucky
9. Little Rock, Arkansas
10. Louisville, Kentucky
11. Nashville, Tennessee
12. Omaha/Lincoln, Nebraska
13. Orange, Texas
14. Richmond, Virginia
15. Spokane, Washington
16. Tulsa, Oklahoma; and
17. Wichita, Kansas

Through the Syncor transaction, Cardinal also acquired the only radiopharmacy operating in Springfield, Missouri.

22. As a result of the Syncor acquisition, Cardinal became BMS's largest Cardiolite distributor and the largest purchaser of other radiopharmaceutical inputs manufactured by BMS.

23. By acquiring Geodax in 2004, Cardinal became the sole radiopharmacy in seven additional markets: Albany, New York; Charlotte, North Carolina; Columbia, South Carolina; Greensboro, North Carolina; Huntington, West Virginia; Knoxville, Tennessee; and Raleigh, North Carolina.

24. After these acquisitions, Cardinal faced the threat that BMS and/or GE-Amersham would license new radiopharmacies in Cardinal's markets, including markets where Cardinal faced no competition. In fact, in 2003, GE-Amersham was developing plans to license new Myoview distributors in most of the relevant markets. Similarly, in late 2003 and early 2004, BMS developed and began to execute an "open channel" strategy to widely expand distribution of Cardiolite to potential competitors of Cardinal across the country.

25. To avoid this outcome, Cardinal engaged in a variety of tactics to induce or coerce GE-Amersham and BMS not to grant licenses to potential entrants in the relevant markets. Through these tactics, Cardinal ensured that GE-Amersham and BMS understood that if they licensed new entrants to compete against Cardinal, Cardinal would take punitive actions against their business interests that would outweigh the benefits of expanding HPA distribution.

### GE-Amersham

26. After Cardinal acquired Syncor, the largest Cardiolite distributor, GE-Amersham was concerned that Cardinal might seek to switch customers to Cardiolite. To protect its Myoview market share, GE-Amersham developed plans to build or license new radiopharmacies in Cardinal's monopoly markets. On its end, Cardinal was concerned that if GE-Amersham

7

carried out plans to facilitate entry, Cardinal would have to lower its prices to meet the new competition.

27. In 2003, Cardinal secured, and thereafter maintained, *de facto* exclusive rights to distribute GE-Amersham's Myoview in the relevant markets in which Cardinal was the sole radiopharmacy.

28. Throughout the relevant time period, Cardinal assured GE-Amersham that Cardinal would be "product neutral" in its dealings with customers and refrain from engaging in promotional efforts with respect to Cardiolite as long as GE-Amersham did not license new entrants in the relevant markets. Cardinal also threatened GE-Amersham with various forms of retaliation if GE-Amersham did license potential entrants.

29. For example, Cardinal warned GE-Amersham that their current and future product relationships in the radiopharmaceutical industry were contingent upon GE-Amersham's maintenance of Cardinal's *de facto* exclusive Myoview rights.

30. As a result of Cardinal's inducements and threats, GE-Amersham continued to treat Cardinal's markets as *de facto* exclusive and denied Myoview rights to numerous radiopharmacy operators that sought to enter the relevant markets.

### BMS

31. On two separate occasions during the relevant time period, BMS began to implement strategies to broadly license new Cardiolite distributors across the country, including in several of the relevant markets. In response, Cardinal employed various tactics to induce and coerce BMS to abandon both its initial open channel strategy and subsequent plans to license new entrants in Cardinal's markets.

8

32. For example, Cardinal threatened to convert Cardinal's Cardiolite sales to Myoview in local markets where Cardinal operated the only radiopharmacy and had access to both HPAs. In these markets, Cardinal was able to incent customers to switch HPAs by altering their relative prices or by promoting one HPA over the other. Cardinal communicated these threats directly to BMS's executives, and demonstrated the credibility of these threats by proceeding with retaliatory conversions in selected markets. The sole purpose behind Cardinal's threatened and actual conversions was to get BMS to abandon its plans to grant licenses, and not for any legitimate business reason.

33. In order to enhance its leverage over BMS, Cardinal requested that GE-Amersham grant to Cardinal the right to distribute Myoview in additional markets.

34. BMS's open channel strategy also posed a direct threat to GE-Amersham's distribution of Myoview. Thus, Cardinal and GE-Amersham had a mutual interest in preventing BMS from developing a rival distribution network that would promote Cardiolite.

35. In making its request for additional Myoview rights, Cardinal recognized this shared interest and warned GE-Amersham that its future relationship with Cardinal in the radiopharmaceutical industry would be jeopardized if GE-Amersham did not comply.

36. As a result, GE-Amersham provided Cardinal with rights to distribute Myoview in additional markets. Cardinal's express purpose for seeking these additional Myoview licenses was to enable Cardinal to threaten BMS with reprisal, and not for any legitimate business reason. After obtaining these rights, Cardinal proceeded to retaliate against BMS in multiple markets by shifting customers from Cardiolite to Myoview.

37. Cardinal also cancelled purchases of BMS radiopharmaceutical inputs, other than HPAs, and shifted them to another manufacturer. Cardinal then threatened additional

9

cancellations and shifts unless BMS abandoned its open channel strategy. Cardinal also conditioned its future purchases of inputs from BMS on BMS ceasing to license new distributors. Cardinal's cancellation and conditioning of input purchases were not undertaken for legitimate business reasons, such as to lower its costs.

38. Beginning in July 2004 and continuing into 2007, Cardinal also repeatedly offered BMS the prospect of averting future competition from Cardinal's generic version of Cardiolite in exchange for exclusivity on Cardiolite distribution prior to the product's patent expiration. Under the arrangement discussed by Cardinal and BMS, Cardinal would forgo launching or manufacturing its own generic upon Cardiolite's patent expiration in 2008 and exclusively purchase generic Cardiolite from BMS. In return, Cardinal required that BMS abandon or severely limit its strategy of licensing Cardiolite to potential entrants in Cardinal's markets prior to patent expiration.

39. Even though this arrangement did not ultimately come to fruition, Cardinal's threats of future generic Cardiolite competition and its offers to forego such competition deterred BMS from licensing new Cardiolite distributors in Cardinal's markets.

40. 'Cardinal's actions, as alleged herein, ensured that the benefits to BMS of granting new licenses to potential entrants were outweighed by the negative consequences of doing so. As a result, BMS denied numerous potential entrants access to Cardiolite in order to appease Cardinal.

## CARDINAL'S UNFAIR METHODS OF COMPETITION HAVE RESULTED IN SUBSTANTIAL HARM

41. As the direct result of Cardinal's actions, from 2003 through early 2008, both BMS and GE-Amersham denied HPA licenses to numerous potential entrants in the relevant markets. In many of the relevant markets, potential entrants were unable to gain HPA rights for

10

this entire five-year period. These potential entrants—rival radiopharmacies—would have competed directly with Cardinal at lower prices but for Cardinal's exclusionary conduct. Cardinal's scheme therefore prevented or delayed competitive entry in each of the relevant markets for varying periods of time.

42. GE-Amersham refused to grant Myoview rights to numerous potential entrants in Cardinal monopoly markets that would have promoted and increased Myoview sales in these markets. GE-Amersham maintained Cardinal's exclusive rights to Myoview even in markets where Cardinal's Myoview sales declined or Cardinal failed to make any Myoview sales at all.

43. Similarly, because of Cardinal's conduct, BMS twice abandoned its chosen and preferred strategy of widely expanding its distribution network for Cardiolite.

44. As a result of the cumulative acts engaged in by Cardinal as described herein, Cardinal acquired, maintained, and exercised monopoly power in each of the 25 monopoly markets for varying periods of time.

45. Cardinal's scheme injured its customers, consisting of hospitals and clinics located in these markets. As compared to customers in competitive markets, Cardinal's customers in the 25 monopoly markets paid higher prices.

46. Cardinal substantially profited from its anticompetitive conduct and collected millions of dollars in ill-gotten gains by charging higher prices and excluding lower-priced competitors from the 25 monopoly markets.

47. Throughout the relevant time period, Cardinal had no procompetitive business rationale or efficiency justifications for maintaining *de facto* exclusive rights to distribute the only two HPAs. To the contrary, Cardinal provided little to no promotional support for either

HPA in its monopoly markets. Cardinal's overlapping exclusives served only to decrease inter-brand HPA competition and to eliminate local radiopharmacy competition.

48. Cardinal's monopolization scheme was finally thwarted by BMS's sale of the Cardiolite brand to Lantheus in early 2008. Upon acquiring the Cardiolite brand, Lantheus opened access to Cardiolite to radiopharmaceutical competitors around the country in mid-February 2008.

49. Though Lantheus's opening of Cardiolite access in early 2008 resulted in competitive entry in a number of Cardinal's monopoly markets, the anticompetitive effects of Cardinal's conduct have not been fully dissipated in all of the affected markets. Specifically, Cardinal remains the sole or dominant radiopharmacy in six markets: Gainesville, Florida, Lexington, Kentucky, Spokane, Washington, Knoxville, Tennessee, Little Rock, Arkansas, and the Omaha-Lincoln, Nebraska metropolitan area. In the absence of Cardinal's conduct, these six markets would likely be two-firm competitive markets today.

50. Through this action, the Commission seeks injunctive relief, including disgorgement, to remedy the injury caused by Cardinal's conduct, to restore competition, and to prevent the recurrence of future violations.

## VIOLATION ALLEGED

51. Cardinal willfully engaged in anticompetitive and exclusionary acts and practices to acquire, enhance, or maintain its monopoly power in the market for the sale and distribution of radiopharmaceuticals in the 25 geographic markets alleged herein for various periods of time between 2003 and 2008. The acts and practices of Cardinal, as alleged herein, constitute monopolization and unfair methods of competition in or affecting commerce in violation of Section 5 of the FTC Act, as amended, 15 U.S.C. § 45.

## PRAYER FOR RELIEF

WHEREFORE, Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to issue a permanent injunction against violations of the FTC Act and, in the exercise of its equitable jurisdiction, to order equitable relief to remedy the injury caused by Cardinal's violations. Therefore, the FTC requests that this Court, as authorized by 15 U.S.C. §§ 26 and 53(b), and pursuant to its own equitable powers, enter final judgment against Cardinal declaring, ordering, and adjudging:

1. That Cardinal's acquisition and maintenance of monopoly power in the relevant markets violated Section 5 of the FTC Act, 15 U.S.C. §45;

2. That Cardinal is permanently enjoined from engaging in similar and related conduct in the future; and

3. That the Court grant such other equitable relief, including disgorgement, to redress and prevent recurrence of Cardinal's violations of Section 5 of the FTC Act, 15 U.S.C. § 45.

Dated: April 20, 2015

DAVID C. SHONKA
Deputy Principal General Counsel

Respectfully submitted,

STEPHEN WEISSMAN
Deputy Director
Bureau of Competition

WILLIAM H. EFRON
Director, Northeast Region

JONATHAN W. PLATT
NANCY TURNBLACER
JARED P. NAGLEY
Attorneys for Plaintiff

Federal Trade Commission
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2827
wefron@ftc.gov
jplatt@ftc.gov